UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO.: 15cr10031 |
| ) | |
| v. ) | Violations: |
| ) | |
| DANIEL THIBEAULT ) | Securities Fraud |
| ) | (15 U.S.C. §§ 78j(b) & 78ff; |
| ) | 17 C.F.R. § 240.10b-5) |
| ) | |
| ) | Wire Fraud |
| ) | (18 U.S.C. § 1343) |
| ) | |
| ) | Aggravated Identity Theft |
| ) | (18 U.S.C. § 1028A) |
| ) | |
| ) | Obstruction of Justice |
| ) | (18 U.S.C. § 1512(c)) |
| ) | |
| ) | Aiding and Abetting |
| ) | (18 U.S.C. § 2) |
| ) | |
| ) | Criminal Forfeiture Allegation |
| ) | (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. |
| ) | § 2461(c)) |

INDICTMENT

The Grand Jury charges that:

General Allegations

At times relevant to this Indictment:

1. Defendant DANIEL THIBEAULT was an individual who resided in Massachusetts.

2. THIBEAULT was the president, chief executive officer and principal owner of Graduate Leverage, LLC, an asset management and financial advisory firm based in Waltham, Massachusetts.

3. Graduate Leverage did business under several different names and through several affiliated entities, including GL Capital Partners, LLC and GL Investment Services, LLC (collectively, "GL"). Both GL Capital Partners and GL Investment Services were investment advisers registered with the Securities and Exchange Commission ("SEC").

4. GL Capital Partners was the investment adviser of the Beyond Income Fund ("the Fund"), a closed-end interval fund owned and operated by GL. THIBEAULT was one of the portfolio managers of the Fund.

5. According to promotional materials and securities filings, the Fund's strategy involved investing in variable rate consumer loans, which loans the Fund would either make directly or purchase from other entities. The promotional materials and securities filings provided that the Fund's capital would be invested in loans to individual consumers, and the interest the Fund collected on those loans would be used to pay dividends to the Fund's shareholders, after deducting the Fund's annual operating expenses, which would be capped at three percent of its average daily value. The documents provided that the dividend income would automatically be reinvested in additional shares of the Fund, unless shareholders elected to receive their distributions in cash.

6. Taft Financial Services, LLC ("Taft") was a limited liability company formed under the laws of South Dakota. Although THIBEAULT was not an owner or officer of Taft, Taft operated at THIBEAULT's direction and under his effective control. THIBEAULT caused Taft to be formed as a special-purpose vehicle, ostensibly for the purpose of issuing individual consumer loans at GL's direction, which loans Taft would then sell to the Fund.

### The Scheme to Defraud

7. Beginning in or about February 2013 and continuing through in or about December 2014, THIBEAULT devised and intended to devise a scheme and artifice to defraud and to obtain money from the Fund by causing the Fund to issue fictitious loans in the names of numerous of THIBEAULT's friends and acquaintances. In fact, the individuals in whose names the loans were issued had not sought the loans, had no knowledge of them, and did not receive any of the loan proceeds. Instead, THIBEAULT used the bogus loans to conceal his diversion of money from the Fund, via Taft, into a GL bank account. From that account, THIBEAULT caused the money to be used, among other things, to pay the operating expenses of GL and its affiliated entities, to pay for THIBEAULT's personal expenses, and to make interest payments on fictitious loans THIBEAULT had previously caused to be issued. This use of investor money was contrary to GL's representations to the Fund's actual and prospective investors, and was not disclosed to them.

### Manner and Means of the Fraud

A. The Beyond Income Fund

8. In marketing materials and securities filings, GL described the Beyond Income Fund as investing principally in consumer loans that satisfied GL's proprietary underwriting standards and that represented a reasonable credit risk. GL indicated that an investment committee would review "each potential Fund investment."

9. For example, a prospectus for the Fund, dated June 2014, set forth the Fund's objective as "investing primarily in individual variable-rate interest income-producing debt securities (i.e. loans made to individuals that are represented by a note (the 'security'))." It stated: "The Fund does not primarily invest in pools of notes, but rather note-by-note. The Fund

acquires notes in both the secondary market and through direct origination with individuals." The prospectus further indicated that the Fund's investment strategy involved "select[ing] securities by identifying note issuers that [GL Capital Partners] believes have satisfactory credit quality – those able and willing to repay their interest and principal." It explained: "When evaluating credit quality the Adviser [GL Capital Partners] uses a proprietary underwriting (credit review) model that relies on inputs such as commercial credit scores and Adviser-generated assessments of an issuer's total debt burden relative to income, other sources of repayment such as liquid assets, payment history including delinquencies and defaults."

10. The June 2014 prospectus further stated:

> The Adviser seeks to reduce default risk by focusing on issuers that it believes are less susceptible to economic downturns such as medical doctors, dentists, veterinarians, attorneys and business owners. It also seeks [to] control risk by diversifying among issuers in various geographic regions. The Adviser seeks to reduce interest rate risk by selecting variable rate notes that are expected to have low price sensitivity to rising interest rates. The Adviser is supported by a research staff as well as by an investment committee that reviews each potential Fund investment.

11. Similarly, in a press release issued on or about July 15, 2014, GL described the Fund as consisting "primarily of individual variable rate consumer loans," and noted that "[p]roprietary loan sourcing channels allow GL Capital to include loans made to young doctors, dentists, attorneys, and other professionals with degrees from top institutions." The press release stated: "At a time of great economic risks, investors seeking any meaningful yield have been forced to assume substantial credit and interest rate risks. The goal of the GL Beyond Income Fund is to provide an opportunity to investors seeking income without high levels of interest rate and credit exposure."

4

12. Initially, the Beyond Income Fund purported to be open only to a select group of investors. GL directed a percentage of the assets of the firm's investment advisory clients into the Fund, and also promoted the Fund to the friends and family of GL employees. In or about July 2014, GL announced that the Fund was open to the general public.

B. The "TA" or "Jumbo" Loans

13. Each loan in the Fund was assigned a unique number and letter code that, among other things, identified the borrower and the loan program type. In the June 2014 Prospectus, GL indicated that the average size of individual loans in the Fund would range between $20,000 and $50,000.

14. Typically, for loans that were part of the Fund, GL directed the Fund's custodial bank to wire money to a transactional bank, which in turn issued a loan to the consumer. In return, the Fund's custodial bank received and held a promissory note obligating the consumer to repay the loan pursuant to certain specified terms. The loans were then monitored and serviced by GL staff.

15. Beginning no later than approximately February 2013, THIBEAULT caused the Fund to issue several dozen loans, with values of hundreds of thousands of dollars, in the names of individuals who were his personal friends or acquaintances. For these loans, which were many times larger than any of the other loans held by the Fund, THIBEAULT caused the Fund's custodial bank to send the money, via wire transfers in interstate commerce, not to a transactional bank, but rather to an account at Bank of America in the name of Taft Financial Services, LLC, a limited liability company that was purportedly controlled by a third party but actually controlled by THIBEAULT, and that issued loans on behalf of the Fund. The loans

were identified in GL's records with the program code "TA," and were referred to by GL employees as "jumbo" loans.

16. In contrast to the other loans held by the Fund, the Fund's custodial bank did not receive the promissory notes that corresponded to most of the TA loans until months after they were issued – or, in some cases, ever. In addition, THIBEAULT directed GL's staff not to service the TA loans, telling them that he would do so personally.

17. In the Fund's annual report, which itemized its holdings, the Fund set forth, for each of the TA loans, its principal amount, the applicable interest or "coupon" rate, the maturity date, and the resulting overall value of the loan.

18. By in or about December 2014, the Fund held approximately 40 TA loans, having a combined dollar value of close to $16 million, and accounting for more than 40 percent of the total assets purportedly held by the Fund.

19. Many if not all of the TA loans were fictitious. The individuals in whose names those loans were issued never applied to borrow money from GL, did not execute promissory notes for the loans, were unaware that the loans had been issued in their names, and did not receive the proceeds of the loans.

20. Instead, at THIBEAULT's direction, the money that was disbursed by the Fund's custodian to Taft – ostensibly for the purpose of issuing the TA loans to the consumers who had purportedly applied for them – was forwarded from Taft's account at Bank of America, via wire transfers in interstate commerce, to a GL operating account at TD Bank. From there, the money was used, at THIBEAULT's direction, to pay, among other things, GL's operating expenses and certain of THIBEAULT's personal expenses. Some of the money was also transferred to THIBEAULT's personal bank account.

21. On at least some occasions, in a further effort to conceal his fraud scheme, THIBEAULT caused the Fund to issue new TA loans in order to generate money that was then used to make interest payments on fictitious TA loans THIBEAULT had previously caused the Fund to issue.

C. The SEC Examination

22. On or about December 4, 2014, the SEC opened a formal investigation into possible fraud at the Beyond Income Fund.

23. On or about December 8, 2014, SEC staff initiated an unannounced examination at GL's offices in Waltham, Massachusetts. During the examination, the staff interviewed THIBEAULT.

24. During the interview, THIBEAULT made numerous statements to SEC staff that were false, misleading, and deceptive, for the purpose of obstructing the SEC's examination.

25. For example, THIBEAULT stated, in sum and in substance, and in part, that the TA loans in the Beyond Income Fund were issued to individual consumers, even though, as THIBEAULT then and there knew and believed, many, if not all of the TA loans were fictitious, and the individuals in whose names those loans were issued knew nothing about them.

26. During the interview, THIBEAULT also stated, in sum and in substance, and in part, that the proceeds of the TA loans issued by the Fund went exclusively to the borrowers listed on the associated promissory notes, or to creditors of those borrowers to pay off existing debts, even though, as THIBEAULT then and there knew and believed, the proceeds of many, if not all of the TA loans were directed into a GL operating account and were used, at THIBEAULT's direction, to pay, among other things, GL's operating expenses and certain of THIBEAULT's personal expenses.

27.     During the interview, THIBEAULT further stated, in sum and in substance, and in part, that neither THIBEAULT nor GL ever made interest or principal payments on any TA loans in the Fund, even though, as THIBEAULT then and there knew and believed, THIBEAULT caused money from GL's operating account – including money from fictitious loans that THIBEAULT caused the Fund to issue or acquire – to be to be used, among other things, to make interest payments on fictitious loans THIBEAULT had previously caused to be issued.

## COUNT ONE
(Securities Fraud)

28. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 27 of this Indictment and further charges that:

29. From in or about and between February 2013 and December 2014, in the District of Massachusetts and elsewhere, the defendant,

## DANIEL THIBEAULT,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme, and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engage in acts, practices and a course of business which would and did operate as a fraud and deceit, in connection with the purchase and sale of securities, to wit, shares in the GL Beyond Income Fund.

All in violation of Title 15, United States Code, Sections 78j(b) & 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

## COUNTS TWO THROUGH FOUR
(Wire Fraud)

30. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 27 of this Indictment and further charges that:

31. On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

### DANIEL THIBEAULT,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Wire |
|---|---|---|
| 2 | 4/5/2013 | Transfer of $764,221 from Union Bank account xxxxxx4880, in the name of the GL Beyond Income Fund, to Bank of America account xxxxxxxx9490, in the name of Taft Financial Services, LLC, purportedly, in part, for a loan issued to Z.W., together with associated notices, account updates and acknowledgments |
| 3 | 5/22/2013 | Transfer of $471,441 from Union Bank account xxxxxx4880, in the name of the GL Beyond Income Fund, to Bank of America account xxxxxxxx9490, in the name of Taft Financial Services, LLC, purportedly for a loan issued to C.B., together with associated notices, account updates and acknowledgments |
| 4 | 9/30/2014 | Transfer of $647,382 from Union Bank account xxxxxx4880, in the name of the GL Beyond Income Fund, to Bank of America account xxxxxxxx9490, in the name of Taft Financial Services, LLC, purportedly for a loan issued to A.O., together with associated notices, account updates and acknowledgments |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FIVE
(Aggravated Identity Theft)

33. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 27 of this Indictment and further charges that:

34. On or about April 5, 2013, in the District of Massachusetts and elsewhere, the defendant,

### DANIEL THIBEAULT,

did knowingly transfer, possess, and use, without lawful authority, means of identification of another person, to wit, the name of Z.W., during and in relation to the violation of 18 U.S.C. § 1343 (Wire Fraud), charged in Count 2 of this Indictment.

All in violation of Title 18, United States Code, Sections 1028A and 2.

## COUNT SIX
(Aggravated Identity Theft)

35. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 27 of this Indictment and further charges that:

36. On or about May 22, 2013, in the District of Massachusetts and elsewhere, the defendant,

DANIEL THIBEAULT,

did knowingly transfer, possess, and use, without lawful authority, means of identification of another person, to wit, the name of C.B., during and in relation to the violation of 18 U.S.C. § 1343 (Wire Fraud) charged in Count 3 of this Indictment.

All in violation of Title 18, United States Code, Sections 1028A and 2.

13

## COUNT SEVEN
(Aggravated Identity Theft)

37. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 27 of this Indictment and further charges that:

38. On or about September 30, 2014, in the District of Massachusetts and elsewhere, the defendant,

DANIEL THIBEAULT,

did knowingly transfer, possess, and use, without lawful authority, means of identification of another person, to wit, the name of A.O., during and in relation to the violation of 18 U.S.C. § 1343 (Wire Fraud) charged in Count 4 of this Indictment.

All in violation of Title 18, United States Code, Sections 1028A and 2.

## COUNT EIGHT
(Obstruction of Justice)

39. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 27 of this Indictment and further charges that:

40. On or about December 8, 2014, in the District of Massachusetts, the defendant,

### DANIEL THIBEAULT,

did knowingly and corruptly obstruct, influence, and impede an official proceeding, and attempted to do so, by making false and misleading representations to the Securities and Exchange Commission concerning the GL Beyond Income Fund, to wit: that the TA loans in the Fund were issued to individual consumers; that the proceeds of those loans went exclusively to the borrowers listed on the associated promissory notes, or to creditors of those borrowers to pay off existing debts; and that neither THIBEAULT nor GL ever made interest or principal payments on any TA loans.

All in violation of Title 18, United States Code, Section 1512(c).

## CRIMINAL FORFEITURE ALLEGATION

42. Upon conviction of one or more of the offenses charged in Counts One through Four and Eight of this Indictment, the defendant,

DANIEL THIBEAULT,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

43. If any of the property described in paragraph 42 above, as a result of any act or omission by the defendant,

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intention of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property described in paragraph 42 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL,

_____
FOREPERSON OF THE GRAND JURY


_____
STEPHEN E. FRANK
BRIAN A. PÉREZ-DAPLE
Assistant U.S. Attorneys


DISTRICT OF MASSACHUSETTS, February 25, 2015

Returned into the District Court by the Grand Jury Foreperson and filed.

Steve York
_____
Deputy Clerk

2-25-15

1:50 p.m.