UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 15-10031-LTS |
| | ) | |
| DANIEL THIBEAULT | ) | |

**<u>SENTENCING MEMORANDUM</u>**

Dan Thibeault had a singular focus: to build his already successful business into a financial services powerhouse as quickly as he could. When, during the years of the Great Recession, Graduate Leverage began showing signs of failure rather than the upward trajectory that was his dream, that singular drive compounded by stress poorly managed by medication gave rise to a series of catastrophic business decisions that ultimately turned fraudulent. But as those who know him best attest, Dan Thibeault's failures do not erase his essential qualities as a kind, generous, good-hearted man who has always tried to look out for the best interests of those around him.

As the plea agreement recognizes, the guidelines sentencing range nominally applicable to Thibeault's offense is far greater than necessary to serve the goals of 18 U.S.C. § 3553(a). Thus, the task before this Court is to fashion the sentence that accurately reflects Thibeault's actual culpability given his conduct and personal history, and that does not result in unwarranted sentencing disparity. For the reasons that follow, the Court should sentence Thibeault to 36 months' imprisonment with a three-year term of supervised release to follow.

## I.      BACKGROUND

### A.  <u>Offense Conduct</u>

The offense conduct is set forth in detail in the PSR at ¶¶ 18-50. While the government suggests disputes regarding matters peripheral to Thibeault's admitted criminal conduct in originating loans in the names of others, it is important to note what *cannot* be disputed:

- Thibeault developed and grew Graduate Leverage over a decade into a successful business that he operated without incident until the comparatively short two-year period when he began diverting money from the Beyond Income Fund through loans to fund his other business divisions;

- The Beyond Income Fund ("Beyond Income") was not a fraudulent enterprise *ab initio* but rather a legitimate mutual fund that did what it was supposed to do, which was to invest in variable rate consumer loans;

- Thibeault himself, family members, and many of Thibeault's longtime friends had significant investments in Beyond Income before Thibeault used the loans at issue to divert money to GL's other business divisions;

- By the time Thibeault turned to the idea of using the loans to divert money to other GL business divisions, he had liquidated more than $2.5 million in liquid assets (representing nearly all of his personal disposable wealth) and poured those funds into GL's failing businesses divisions, which employed upwards of 120 people, to keep them afloat;

- While most of GL's divisions were hemorrhaging money, one division, GL Advisor, remained profitable and generated sufficient income to service the loans Thibeault used to divert money to the unprofitable divisions;[1]

- Thibeault did not personally gain in a significantly material way from diverting money from Beyond Income, as the vast majority of the $15 million that Thibeault diverted was infused into commercially legitimate, albeit failing, businesses; and

- While there can be no doubt that the Beyond Income Fund's investors suffered significant harm, harm for which Thibeault acknowledges his full responsibility, a substantial portion of the Beyond Income Fund's assets remain.

---

[1] Charts documenting Graduate Leverage's organizational structure and the flow of funds from its GL Advisor unit is attached hereto as Exhibit A. The flow of funds schedule was compiled from (i) internal company financials that were created by GL's controller; and (ii) the loan roster for the Beyond Income Fund's loans which were maintained by the GL's loan servicing team.

In sum, the offense at issue and Thibeault's conduct in committing fraud is, while criminal, far removed from the mine-run of predatory fraud that most often reaches this Court. As explained more fully below in Section II, the Court should give the nominally applicable guideline sentencing range minimal weight and sentence Thibeault to 36 months' imprisonment, a substantial sentence that is sufficient but not greater than necessary to achieve the goals of 18 U.S.C. § 3553(a).

## B. **Thibeault's History and Circumstances**

### 1. **Thibeault's History**

Thibeault's history is detailed in the Presentence Report at ¶¶77-105. As the PSR notes, he overcame diagnoses of dyslexia and Attention Deficit Hyperactivity Disorder to excel in grade school, attend Dartmouth and graduate schools, and embark on a career in finance. Family and friends remark that, notwithstanding his rapid ascent to success, Dan has always had a down-to-earth nature and throughout his lifetime has demonstrated a consistent and unwavering dedication to his family and friends. *See, e.g.,* PSR ¶87. Letters of Support on Dan's behalf, attached hereto as Exhibit B, confirm Dan's essential good nature. His aunt, Pam Blajda, recalls Dan's generosity with elderly members of the extended family and his joy at assembling the extended family under one roof for vacations. Exhibit B at 4-6. A close family friend, Elaine Blizzard, comments that even as he grew from a child into a wildly successful businessman, he retained his essence as the "sweet man" she knew as a boy. Exhibit B at 7.

Perhaps the most poignant portrayal of Dan is from Mark Abel, a friend since their time at Dartmouth who is also a victim of Dan's offense. Notwithstanding the fact that he has lost a substantial sum as a result of Dan's actions, Mr. Abel writes:

> The Dan Thibeault that I know is someone that throngs of people gravitated
> toward. He had a big personality and it was genuine. He told stories, he made

people laugh, he was generous with family and friends. About 10 years ago, one of our college football coaches came under financial difficulty while paying for his wife's medical bills. We raised money so this coach would not have to sell his home. Dan was one of the first people to contribute and also one of the largest contributors when we, ourselves, did not have much money.

Exhibit B at 11-12.

Another longtime family friend, Jonathan Smith, concurs, but also writes of some of the difficulties and challenges Dan faced growing up that lingered into adulthood:

He tried to do the right thing ultimately but sometimes had problems getting there. He said and did things that his peers did not understand at the time. He was often 'ahead of us' yet never made us feel as though we were anything but his equal. He has talents and insight that few do. But I suspect that 'gift' also helped to complicate and recently conflict him with something to which only he can answer.

Exhibit B at 10. Dan's family and close friends remarked on a discernable change in him as, unbeknownst to them, GL began faltering. As Mr. Smith noted in a vignette:

In the spring of 2010, I went on a weekend golf outing with Dan and some other friends. Dan was rather distracted one of those nights and kept his head down reading his laptop in the hotel room. After a long while, I interrupted him and asked why he was miserable. Dan explained that the federal government was close to taking over the student loan business which would essentially end his company. Some time went by before we resumed the discussion when I asked him why he couldn't change his focus to hanging out with his friends. Dan replied that he was trying to determine the assets of the company and how to share it among all the employees that he was no longer going to be able to employ. He explained that he intended to hand everyone a piece of the company's liquidated worth and was particularly sad, if I recall correctly, about a new marketing person who just relocated to take a job with his company. He told me that this situation took his utmost focus.

Exhibit B at 10. Thibeault's demeanor and behavior took a change for the worse as GL's financial heath continued to worsen and he embarked on the series of catastrophic business decisions that included the phony documentation of loans. Stress begat anxiety that begat overreliance and abuse of his prescription medication. *See* PSR ¶¶91-92. His mother, Patricia Thibeault, writes of this period:

As Dan grew more successful his father and I saw Dan and his family less, and when we did he was ALWAYS working. Dan's behavior was extreme–on most occasions it was as though Dan was not present. His personality was altered but I attributed this to the stress of business.

Even at holiday gatherings Dan was always on his laptop, working compulsively. I knew that Dan did not use drugs or alcohol by personal choice. I knew Dan had been prescribed Adderall and Xanax, however the fact that these were prescribed drugs mislead me to believe they would not dull his conscious mind as alcohol and other drugs can. I saw only glimpses of this frantic way of life but it worried and disheartened me. I simply thought that Dan was losing all his good traits in the pursuit of wealth and success.

Exhibit B at 1-3. Thibeault's wife, Shawnet, documents the change from the most intimate

vantage point:

In early 2009 Dan was increasingly anxious and began having panic attacks [as a consequence of navigating GL through the worldwide credit crisis]. He lost over 30 lbs. in just over a month, which led him to see his primary care physician for help. His visit resulted in prescriptions for Xanax and Celexa. From Dan's perspective this had "cured" his anxiety, but it left him lethargic and unable to focus. To address these new symptoms he was prescribed Adderall. The change in him was dramatic and immediate. The combination of these drugs and Dan's eventual addiction to them completely changed the person I knew and loved.

Within a year of this prescription drug regimen Dan was exhibiting risky and abnormal behaviors I have never seen in him. During a family vacation in 2011 Dan entered the ocean at a beach that had been closed due to high surf and rip currents. The conditions were so brutal the lifeguards refused to attempt to rescue him. After Dan was lucky enough to escape the currents he literally washed up on shore and had to have his lungs cleared of sea water. This is just one example out of many incidents in which Dan displayed risky and aberrant behavior. It later became clear to me that these were a precursor to the poor decisions he would make with the business.

Exhibit B at 17-18. Christine MacPherson, a former Graduate Leverage employee whose

husband is also a victim, observed first-hand the erratic behavior that were a consequence of the

stress and the drug regimen:

[In 2013] the atmosphere [at GL] could best be described as highly chaotic. The business had experienced considerable turnover in management. Dan seemed to be addressing this by shouldering ever more responsibility, resulting in him having as many as twenty five direct reports. He was also burning the candle at

both ends in the worst way. He was working "all-nighters" twice a week and
spending all waking hours in the office. When he did sleep, he did so on his office
floor. It was not uncommon for employees to enter to find Dan lying face down
on the carpet, passed out from exhaustion.

Exhibit B at 17. Notwithstanding these observations of erratic behavior, Ms. MacPherson is

convinced that Dan was trying his best to look out for the best interests of his employees and

investors:

Knowing what I know now, I understand that Dan was doing everything he could
to try to save the business which seemed to have led him to make poor decisions
resulting in his arrest and guilty plea. It is critical however for you and the other
investors to know that the notions of Dan as a greedy corporate executive could
not be further from the truth.

Those who saw Dan during the final two years GL was in business saw a person
who was putting 110% of his life into the company. He did not come off as
someone proactively scheming but a man flailing miserably as he sunk deeper
into a hole. While he might not have carried himself in the best manner at all
times, he still cared deeply about his employees and wanted the best for them and
the company's clients. I do not know why Dan made such terrible decisions which
resulted in the losses suffered by my family and so many other investors. I do
know that it was not out of greed or any desire for personal gain.

Exhibit B at 18.

Despite all of the changes in personality and behavior she witnessed during the time

leading up to Dan's decision to start taking out phony loans from the Beyond Income Fund,

Shawnet Thibeault sums up Dan's essential character this way:

Simply put, Dan is a great person with a beautiful heart. He is compassionate and
loving and certainly the least judgmental person I have encountered. He is a
wonderful father that our son admires in every way possible. I love this man with
all my heart and soul. He lost his way, but what happened is not a reflection of
Dan's true character.

Exhibit B at 20.

## 2.  **Thibeault's Current Circumstances**

Thibeault was a successful businessman with no criminal history before committing the instant offense. He and his family have been financially and psychologically destroyed as the consequence of his decision to divert ever larger amounts of money from the Beyond Income Fund to other divisions of his company. Where his net worth once exceeded $20 million, he now has no assets to his name and no income to support his family save the small allowance that he is permitted from the seized assets that will ultimately be distributed to the Beyond Income Fund investors. He now is sometimes reduced to riding his bicycle to town to do errands because he lacks the means to fill his car with gas. Where he once had the resources to call upon Boston's most prestigious and high-priced law firms, he now relies on food stamps to make ends meet and is represented by an Assistant Federal Public Defender. The family can no longer afford to travel, making it impossible for his wife and son to visit his wife's family in Indiana during the holidays. They can afford none of the extras that were a routine part of his son's life growing up. Sorely needed dental work for Dan is on hold.

Thibeault's wife and son, who depend on him for emotional and financial support, have already suffered greatly from the fallout of Thibeault's conduct. Nearly immediately after Thibeault's December 2014 arrest, his wife fell into a deep bout of anxiety and depression. She lost 30 pounds over the next seven months, which caused pancreatic dysfunction and led to her being hospitalized for six days. She continues to be treated for depression while she prepares for life after Thibeault's incarceration. His seven-year-old son witnessed his May 2015 arrest, and the family grapples with explaining Thibeault's impending departure from his life, an event that the Letters of Support repeatedly document will be traumatic. *See* Exhibit B at 2 (Letter of Patricia Thibeault)("Dan is the key parent and without his father J[] will suffer greatly"); at 7

(Letter of Elaine Blizzard)(Dan makes sure his son has support in school and school activities, "Dan's son adores him"); at 10 (Letter of Jonathan Smith)("Dan is a tremendous father to his son J[]"); at 12 (Letter of Beyond Income Fund Victim Mark Abel)(Dan "cares deeply about his family and especially his son, J[] . . . I have hope that Dan will get to have a meaningful role in J[]'s youth"). As Shawnet puts it:

> Dan is the world to our son and he's the apple of Dan's eye. J[] still greets his father with a big hug every time Dan returns home and the two of them are all but inseparable. He is an only child and Dan is his father, best friend and superhero all rolled into one.

Exhibit B at 18.

Once a rising star admired in the financial services with offices in two countries, the publicity surrounding the demise of GL and the revelation of criminal conduct has left him reviled in that world. The stain left by his actions in trying to save GL at all costs will forever overshadow the memory of the many years of phenomenal success he and those who invested with him enjoyed. Perhaps most painful for Thibeault, he faces the opprobrium of the victims who lost money investing in Beyond Income, some of whom he counted as close friends but whom he utterly disappointed when he turned to fraud in his desperation to save his business.

Thibeault's three-week detention for violation of release conditions and the comeuppance engendered by GL's complete demise has been the impetus for self-reflection. He stopped taking the prescription medications that contributed to his clouded judgment and turned to meditation, counseling, and Narcotics Anonymous meetings. PSR ¶95. He volunteers his time to Spectrum Health's Westborough substance abuse program, a local animal rescue shelter, the Metrowest YMCA, and Narcotics Anonymous events. Those who have known him for years have witnessed the marked change. His mother Patricia writes:

> In late February of 2015 Dan stopped all the drugs he was on. When I visited Dan in early March I immediately noticed that he was completely himself—his old self, and an emotional wreck. He cried through every moment of my long visit. I would say at that point he was living minute to minute.
>
> I feared for him, sunk in the immense suffering I saw. He was sleeping little, tormented by nightmares, and in the depths of remorse and self-loathing. I suggested he join AA or NA, thinking it might be a place to talk and release some of this intense emotional pressure. Dan has always been a person with many friends but at that time he was alone in almost every sense.
>
> Now I talk to Dan daily, and have been to visit on many occasions in the last year. Over this time I have observed Dan grope along from trauma toward recovery.

Exhibit B at 1-2. Similarly, close family friend Elaine Blizzard describes a man she sees as "contrite." Exhibit B at 7. Those he has met since the downfall of GL would not recognize the man that some victims are said to describe as "callous." Jim Martin, who met Dan through his work at Narcotics Anonymous, lauds Dan as a person with "a huge heart" and a "blessing for me and others at NA." Exhibit B at 13. Like his family and longtime friends have described, Mr. Martin recounts Dan's continuing acts of kindness and generosity. *Id.* Another friend from NA, Andrew Berardi, documents the changes he has observed in Dan during this period of self-reflection:

> Dan has undergone a tremendous change over this past year which I believe you should be aware of when determining his sentencing.
>
> When Dan attended his first meeting he could not even talk. His deep pain was visible to us all. We encouraged him to share but all he could do was cry. It took some time before he could even make it through one of the meeting's short readings without breaking down. He was obviously filled with shame, anxiety, fear and remorse. I could see that he was determined to improve himself and turn his life around. As he embraced the NA program he began to open up to the group and share about his life and addiction. Dan showed great courage by continuing to come to meetings even though he was struggling so greatly.

Exhibit B at 14. Like those who have known him for a long period of time and those who have more recently become friends, Mr. Berardi is particularly touched by Dan's willingness to help and generosity. *Id.* Mr. Berardi adds:

> Above all, Dan has spoken openly about his moral failings and his desire to improve himself and make amends to those he has hurt. It is obvious that he accepts responsibility for his actions and would like to redeem himself however possible.
>
> Dan has displayed the utmost sincerity and composure while facing the possibility of a severe prison term. I know for a fact that his troubles have made him a better person and he is now on a great path personally and spiritually. I wish you knew Dan as I do, and I hope you will take my thoughts into account when sentencing him.

Exhibit B at 14. Despite the life-changing challenge of her husband's impending prison sentence will present, Shawnet Thibeault sees a silver lining:

> Dan has returned to his old self and in so many ways become a better person since his arrest. On February 14th, 2015 he flushed the remainder of his prescriptions down the toilet and attended his first NA (Narcotics Anonymous) meeting. He attends three meetings a week and often speaks and volunteers at events. He engaged a practice of mindfulness and mediation to foster alternative means to control his anxiety. He now talks often of helping others who face similar challenges and I know he can be a tremendous resource. It's such a terrible shame that it had to come to this for my husband to find his true nature. I know he would give anything to change the circumstances of all those he impacted. Nonetheless, I can do nothing but admire the fact that he has met this adversity head-on and has used it to become a better person.

Exhibit B at 17.

## II.    DETERMINING THE SENTENCE

The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)–(7).[2]

"While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice:  Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011); *see also United States v. Ovid*, slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so."). A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which is taken into account by the guideline range.

---

[2]The parties' submissions to the Probation Department suggest two guideline specific calculations for resolution by the court, specifically (1) whether five or more of the victims suffered financial hardship that is "substantial" under a new enhancement provision to U.S.S.G. § 2B1.1, and (2) whether Thibeault's narrative of the background of his fraud warrants the denial of acceptance of responsibility. In defendant's view, neither issue merits much further discussion beyond the submissions. As to whether the hardship is "substantial," defendant relies on his objection to the Presentence Report. As to acceptance of responsibility, the government's complaints about the accuracy of who knew what and whether Thibeault relied on others when he took certain actions simply do not matter. Thibeault has, and continues to, unequivocally admit that it was he that put the plan into motion, that it was his conduct that turned criminal, and that it was he caused the loss to the fund.  Thibeault has accepted responsibility and thus should be accorded the reduction in offense level.

A.  **In Considering the Appropriate Sentence, the Fraud Guideline Is of Little Utility**

Regardless of the Court's resolution of the guideline offense level issue, the mitigating circumstances surrounding Thibeault's commission of the offense call for a sentence significantly below the advisory guideline range.

1.  **Criticism of the § 2B1.1 Is Longstanding**

The Sentencing Commission's decision to employ notions of loss to culpability has long been criticized. *See, e.g., United States v. Emmenegger*, 329 F.Supp.2d 416, 427-28 (S.D.N.Y. 2004) (fraud guidelines "place undue weight on the amount of loss involved in the fraud," which in many cases "is a kind of accident" and thus "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence"; *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006) ("inordinate emphasis" on loss as measure of culpability unexplained by the Sentencing Commission).  The resulting high guideline sentencing ranges with weak and unexplained correlations to the sentencing goals of 18 U.S.C. § 3553(a) have been exacerbated by the "unplanned upward drift" of sentences generated by both perceived and specific directives of Congress and the Department of Justice. See Frank O. Bowman III, *Pour Encourager Les Autres?*, 1 Ohio State J. Crim. L. 373, 387 (2004). *See also* Parker & Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 Am. Crim. L. Rev. 289, 318-20 (1989) (two former sentencing commissioners suggesting that increases in the loss tables were attributable to DOJ's persuasive force, and were "gratuitous," "overtly political and inexpert"). Moreover, the Sentencing Commission's decision to use loss as a proxy for culpability fails to account for differing degrees in culpability amongst co-defendants in a particular case. See *United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008)(en banc) (noting "wide variety of culpability" among defendants with same amount of calculated loss under §2B1.1). As the

penalty for loss has climbed over the years, this factor has been criticized as a highly imperfect measure of the seriousness of an offense. *See United States v. Gupta*, 904 F.Supp.2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, see 18 U.S.C. § 3553(a)...."); *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight" to this factor).

Not surprisingly given this background, the widespread judicial disagreement with the fraud guideline has manifested itself in sentencing decisions. In fiscal year 2012, a bare majority of fraud cases were sentenced within the guideline (50.4%). *See* United States Sentencing Commission, *2012 Sourcebook of Federal Sentencing Statistics*, tbl 27A. By 2014, the number dropped to 43.3%, and in the first quarter of FY 2015, to 40.1%. The reduction in sentences is encouraged by the government, which increasingly supports (at its pleasure) below-guideline outcomes (28% in FY2014). This downward trend is apparent in a broader look at sentences nationally: the rate of national guideline compliance has been falling, from 52% in 2012, to 51% in 2013, to 46% in 2014. The rate has also been falling in this District, from 43% in 2012, to 39% in 2013, to 23% in 2014, to 20.8% in the first quarter of FY 2015. In this District as well, the government has assisted this decline, sponsoring 16% of reductions in 2012, increased to 21% in 2013, to 29% in 2014. The extent of reduction is similarly significant–the median below-range sentence was about 50 percent below the guideline minimum. *See* United States Sentencing Commission, *2012 Sourcebook of Federal Sentencing Statistics*, tbls 30, 30A, 31, 31A, 31B, 31C, 31D.

## 2. Efforts to Better Address Culpability in Fraud Cases: The American Bar Associations' Proposed Amendments to the Fraud Guidelines

Responding to the widespread judicial and academic criticisms, the Criminal Justice Section of the American Bar Association in 2013 assembled a Task Force to evaluate the reforms needed in the sentencing of federal economic crimes and to draft a proposed federal sentencing guideline to effectuate those reforms. The Task Force consisted of five professors, three judges, six practitioners, two organizational representatives, and observers from the Department of Justice and the Federal Defenders, and issued a Report that included a recommendation to restructure the fraud guideline to better capture salient offense characteristics, in particular culpability. A copy of the American Bar Association Criminal Justice Section Task Force Report on the Reform of Federal Sentencing for Economic Crimes ("ABA Report") is attached hereto as Exhibit C. The Task Force eschewed the heavy reliance on loss as the driver of sentence length that characterizes §2B1.1, substituting instead a calculus of culpability and a more granular assessment of victim impact.  Id. at pp. 1-3.[3] In regard to culpability, the Task Force developed culpability factors–(a) the nature of the intent (ranging from predatory to "gatekeeping,"), (b) the extent or lack of actual financial gain to the defendant, (c) the degree of sophistication used to commit the scheme, (d) its duration, (e) extenuating circumstances surrounding the commission

---

[3] The ABA Task Force's reflects courts' longstanding acknowledgment that a defendant's motive is highly relevant at sentencing.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Mahan*, 232 F.App'x 796, 799-800 (10th Cir. 2007) (sentence was procedurally unreasonable where district court refused to consider defendant's stated motive for possessing unloaded shotgun, *i.e.*, that he had been violently beaten by three men and sought to defend his wife); *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat"); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (defendant did "not act for personal gain or for improper personal gain of another"). It also reflects the Sentencing Commission's slow efforts to better calibrate motive and intent into fraud cases. *See* U.S.S.G. § 2B1.1, *comment.* N. 3(a)(ii)(specifying that "'Intended loss' [] means the pecuniary harm that the defendant *purposely* sought to inflict")(emphasis supplied).

of the fraud, (f) efforts to mitigate, and (g) significance of loss to victims–with the goal of

settling a defendant into one of five classes of culpability and corresponding increase or decrease

in Total Offense Level. Id. at 2. The Task Force envisioned that the "end result of the court's

analysis should be culpability level that 'ranks' the defendant in the hierarchy of five levels of

culpability for all defendants sentenced under this guideline." Id.

> Of specific salience to the Task Force was the motive/intent of the defendant in

committing the offenses. The Task Force's recommendation would recognize a category of

offenses it titled "legitimate ab initio":

> These offenses often arise from otherwise legitimate efforts that have crossed
> over into criminality as a result of unexpected difficulties. Even though such
> offenses may be intended to cause loss for the purpose of generating personal gain
> to the defendant or to others involved in the criminal undertaking, they rank lower
> on the culpability scale than predatory offenses.

Id. at 3. The ABA Report also identified a category off offense conduct it denominated as "risk

shifting" conduct:

> These offenses are not specifically intended to cause loss. Instead, they shift the
> risk of any potential loss from the defendant (or from others involved in the
> criminal undertaking) to a third party, such as the victim of the offense. Examples
> include false statements for the purpose of obtaining a bank loan that is intended
> to be repaid. Such offenses are generally less culpable than those where loss is
> specifically intended.

Id. To illustrate the operation of these recommendations, the ABA Report included four Case

Scenarios to demonstrate how its recommended changes would better capture culpability. Id. at

11-15. In the Task Force's view, the most serious sentences were reserved for those

demonstrating the features of Case Scenario 1, a fraudulent lottery scheme where there was no

legitimate value to the product purported to be sold. See, e.g., United States v. Miller, District of

Massachusetts, Criminal No. 14-10185-LTS (defendant used her position as a trusted financial

and investment adviser to solicit more than $4 million from 80 low and middle-class clients to

invest in non-existent funds with the intent to use it for personal purposes). Here, by contrast, it is undisputed that the Beyond Income fund and his other business divisions had legitimate, independently recognized value. Nor is it a case where Thibeault targeted investors because of their vulnerability; here the investors here were largely well-to-do professionals who had the means and ability to weather some (or, in some cases, large) losses. Indeed, Thibeault had little involvement in the direct soliciting of investors at all. And, of course, Thibeault did not realize direct financial gain from any of the investors.

The ABA Task Force's Case Scenario 2 presciently captures the salient features of Thibeault's motive and intent here and provides a principled framework for accurately gauging and incorporating Thibeault's actual culpability. *Id.* at 13 (Case Scenario 2). The scenario posits the owner of a legitimate business for many years whose business came on difficult times. The owner engaged in a criminal scheme to enable borrowing to fund the company. The defendant in the Task Force scenario also attempted to support the operations of the business by liquidating his personal assets and investing the proceeds into the business. While value remained in the business after collapse, the victim was nevertheless left with a loss of approximately $6.9 million. Additionally, *post-hoc* revealed that during the period of the fraud the defendant contributed more funds to the business than he withdrew from it in salary and other compensation. *Id.* The Task Force explained that despite the high loss level, the defendant's actual culpability had to be taken into account:

> This scenario presents a mixture of legitimate ab initio and risk shifting fraud. Although the offense had some degree of sophistication, the less culpable motive, zero gain to the defendant, extenuating circumstances, and efforts to mitigate harm result in a "low culpability" score. The victim impact is also rated as "low" given that it involved a single institutional victim, but not minimal given the magnitude of the loss and the difficulty of the detection of the offense and the efforts needed to mitigate its harm. It is assumed the defendant would receive a leadership role in the offense adjustment under Chapter Three.

*Id.*

For precisely the reasons the Task Force identified in its scenario, Thibeault's motive, his lack of personal financial gain, the extenuating circumstances surrounding the fraud, and his efforts to mitigate it all indicate low culpability. In Thibeault's case, the recommendation might result in the following calculation:

| | |
|---|---|
| Base Offense level: | 8 |
| Loss: | +10 |
| Low culpability: | -5 |
| Moderate victim impact | +2 |
| Role in the offense | +4 |
| **Total Offense Level** | **19** |

The ABA Task Force's proposal would thus yield a guideline sentencing range of 30 to 37 months based solely on the offense conduct notwithstanding acceptance of responsibility and *before* consideration of any other § 3553(a) factors, including Thibeault's compromised mental functioning brought about by his reliance on prescription medications discussed in Section I *supra*. *See* PSR ¶91-92 and Exhibit B.

To be sure, reasonable minds could quibble with the specific calculations set forth above. Does the size of the pool of investors increase the "victim impact" to high rather than moderate? Does the fact that Thibeault had a basis for believing that the loans with phony documentation would nevertheless be serviced as long as GL Advisor continued its profitable trajectory push his conduct into the "lowest culpability" category resulting in a more substantial decrease? At the end of the day, it does not matter. The ABA Task Force Report identifies significant failings in the fraud guideline and demonstrates that this is a case where mechanical application of the

sentencing factors in §2B1.1 result in a sentence that has little connection to Thibeault's actual culpability. A sentence of 36 months' imprisonment more accurately punishes Thibeault's actual culpability while simultaneously balancing the remaining factors and goals set forth in 18 U.S.C. § 3553(a).

### B.  Comparable Cases Support a Sentence of 36 Months' Imprisonment

In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008),  Judge Block in the Eastern District of New York took a collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders. At the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases. *Id*. at 752. Based on these samples, the court concluded that "[t]hose [defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id.* at 753. The court relied on this national pattern in arriving at a sentence of 60 months for the two defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of the applicable guideline range. *Id.* at 745.

The Parris brothers' culpability in their massive fraud is far higher than Thibeault's in the instant matter. The Parrises were convicted of a "pump and dump" scheme that artificially inflated the price of a penny stock; the funds netted from the issue of 28.6 million shares of the stock were quickly wired into accounts controlled by the brothers and then to the brothers themselves. *Id.* at 746-47. And the  Parrises  had  no  particular mitigating factors, unlike the factors mitigating Thibeault's conduct here. Judge Block's decision to sentence the Parris

brothers to 60 months' imprisonment supports the inherent reasonableness of a 36-month sentence for Thibeault.

As Judge Block recognized in Parris, fairness and uniformity in sentencing often can best be achieved by considering how and whether the ultimate sentence imposed in other cases in comparison to the advisory guidelines sentencing range that applied to the particular defendant before the court for sentencing. *Id.* at 752-53. Consistent with Judge Block's prescient insight, attached as Exhibit D to this Memorandum is a nationwide compendium of cases incorporating those surveyed by Judge Parris with more recent sentencing decisions in large-loss securities fraud cases. Additionally, selected District of Massachusetts are identified and discussed below. The compendium, cases from this district, the Sentencing Commission's data, and the ABA Task Force's Report all combine to demonstrate that a sentence of 36 months' imprisonment for Thibeault is utterly reasonable and warranted.

### 1.    National Cases

The chart below includes a sample of fraud cases from districts across the country, many of which involved losses far greater than in this case, in which defendants received sentences substantially below the guideline ranges applicable in those cases and the range applicable to Thibeault. As here, none of the defendants in these cases received a departure based on cooperation.

The chart demonstrates that sentences correlating with the advisory guideline sentencing range nominally applicable to Thibeault are reserved for the most massive of frauds in which the defendants personally gained. *See, e.g., United States v. Hotte*, 1999 U.S. App. LEXIS 20142 (2d Cir. 1999) (108 months' imprisonment for CEO of publicly traded company where loss totaled $67 million); *United States v. Forbes*, Slip Copy, 2007 WL 141952 (D.Conn. 2007) (board

chairman sentenced to 120 months where loss approximately $14 billion); *United States v. Kumar,* 1:04 CR 00846 ILG (S.D.N.Y.) (CEO of computer company sentenced to 144 months where estimated loss approached $8 billion); *United States v. Earls*, 157 Fed. Appx. 421 (2d Cir. 2005) (summary order) (125 months where established loss exceeded $20 million). In each of these cases, the estimated loss and the culpability of the conduct as measured by avarice dwarf the loss and quality of conduct in Thibeault's case. Indeed, the loss and quality of conduct in cases far exceeded the circumstances of this case even where the sentence was far less than the range nominally applicable to Thibeault. *See, e.g., United States v. Trupin*, 475 F.3d 71 (2d Cir. 2007) (reversing judgment of the district court), *cert. granted and judgment vacated*, 128 S. Ct. 862 (2008) (seven months' imprisonment where tax loss exceeded $6 million).

Notable among the more recent sentencing decisions are cases connected to the collapse of Bernard L. Madoff Investment Securities. *See United States v. Jerome O'Hara, et al.,* Southern District of New York Docket No. 10-CR-00228-LTS. The salient facts of the Madoff case are well known, as is the fact that the loss of $155 billion and number of victims dwarfed any other fraud case by several orders of magnitude. Defendants who were central to Madoff's scheme but nevertheless went to trial included Daniel Bonventre, Madoff's Director of Operations. After conviction, Bonventre's guideline sentencing range was literally off the Sentencing Commission's guideline sentencing range chart, with the result that the statutory maximum of stacked consecutive counts resulted in a guideline range of 220 *years*. Notwithstanding these features, the government requested a sentence of twenty years for Bonventre. The district court sentenced Bonventre to ten years. Other defendants who were convicted after trial, who had directly benefitted by the stratospheric riches generated from the

fraud and who had similar off-the-charts guideline sentencing ranges, received sentences of as low as 30 months.

The cases collected by the Eastern District of New York and the more recent sentencing decisions compel the conclusion that the advisory guideline sentencing range in Thibeault's case can only promote a shocking disparity that cannot be countenanced by 18 U.S.C. § 3553(a)(6). Review of similar cases militates in favor of a 36-month sentence for Thibeault in this case.

### 2.     District of Massachusetts Sentencing Decisions

Similarly, courts in the District of Massachusetts have routinely meted out sentences far less than that suggested by the advisory guideline range here in circumstances where the loss and conduct were far more egregious. *See, e.g., United States v. Morris Goldings*, Criminal No. 01-10433-WGY, Statement of Reasons (sentence of three years for defendant attorney where loss figure of $12 million represented "one of the largest, most extensive thefts from vulnerable clients that this Court has ever seen and may have existed in the history of the country"); *United States v. Pimental*, 367 F. Supp. 2d 143 (D. Mass. 2005) (defendant construction company owner in workers compensation fraud case sentenced to probation where loss figure $502,332.07); *United States v. Mueffelman*, 400 F. Supp. 2d 368 (D. Mass. 2005) (27 months' imprisonment for home mortgage promise scheme where $907,000 loss spread across over 300 victims). *United States v. Patricia Miller*, 14-cr-10185-LTS (72 months' imprisonment for investment advisor who misappropriated $4.1 million from 83 low and middle-class victims over 12 year period for personal use); *United States v. Eric McPhail,* Criminal No. 14-10201-DJC (65% variance after trial to 18 months' imprisonment in conspiracy to commit securities fraud case); *United States v. James C. Fields,* Criminal No. 10-10388-DPW (60 months' sentence, a

downward variance of 77% from 262-329 GSR, after trial in securities fraud case where loss exceeded $8 million).

To be sure, defendants in the District of Massachusetts have received severe sentences for their conduct in carrying out securities fraud cases. In *United States v. Arnet Waters*, Criminal No. 12-10336-DJC, Judge Casper varied downward by just 22% from a sentencing range of 262-327 months to impose a sentence of 204 months. In complete contrast to Thibeault, however, Waters's purported investment vehicles, for which he collected more than $9 million over a decade, were nearly completely fictitious and the money was instead put to Waters's personal use. As Judge Casper put it, Waters "engaged in what was a decade-long fraud that included using your company and your position as the head of that company to bilk investors, including friends, support group members, fellow church goers, out of money." Similarly, the defendant in *United States v. Frank Russo*, Criminal No. 07-10127-WGY, defrauded 414 victims who he had solicited to manage more than $20 million over a 20 year period. Rather than investing in bonds and investment grade securities, Russo transferred the money to an entity he controlled which returned no profits for investors. Russo instead used investor money for personal expenses, including the purchase of multiple vacation homes. Judge Young departed downward only modestly from the range of 235-292 months to impose a sentence of 216 months because, as he put it, "[t]his was flat-out fraud, flat-out, face-to-face, intentional fraud, where you very well knew you were taking people's life's savings and using them for your own personal financial gain." Judge Young went on to identify Russo as an outlier in securities fraud cases: "The predator [sic] and personal nature of your fraud is simply unparalleled in the experience of this Court."

Thibeault submits that the unifying principle underlying the sentencing decisions in these cases is that predatory schemes with the goal of personal enrichment are deserving of the higher sentences suggested by the sentencing guidelines. Thibeault's offense conduct has none of the hallmarks of a predatory scheme and is nearly bereft of personal avarice, and in any event does not remotely approach the quality of greed present in cases where defendants have received much lighter sentences than that suggested by the advisory sentencing guideline range in this case. A 36-month sentence more properly represents the nature and circumstances of Thibeault's offense and his motivation in committing it.

### 3. The *Bitran* Plea and Sentencing

One additional sentencing in a securities fraud case in the District of Massachusetts merits specific attention in ensuring that Congress's goal of avoiding unwarranted disparity is met. In *United States v. Bitran*, Criminal No. 14-10243-MLW, the government investigated and charged a father and son with securities fraud in connection with a hedge fund they operated. According to the government, the pair solicited as much as $500 million of investor money based on misrepresentations about their investment model and the returns it generated. *Bitran,* D.E. 1 (Information). They collected $16 million in fees for themselves from those who invested with them. *Id.* After the 2008 downfall and an SEC investigation, it was determined that the investment model described did not exist and investor funds were instead partially invested in other fraudulent funds, including a feeder fund for Bernard Madoff. *Id.* During the course of their fraud, the Bitrans produced falsified investment track records for investors and later provided similar false track records to the SEC. *Id.* When it became clear that the Bitrans' hedge fund was experiencing severe losses in the 2008 downturn, the pair deferred redemptions from investors but redeemed more than $12 million of their own holdings for their personal use and in the

following years attempted to shield those assets. The actual loss to investors, according to the government, was $140 million. *Id.*

The Bitrans pled guilty to a single count of conspiracy to commit securities fraud, wire fraud, and obstruction/falsification of documents pursuant to a plea agreement. *Bitran*, D.E. 11 & 12. The plea agreement included a sentencing guidelines calculation that stipulated the base offense level and all enhancements other than loss. In the government's view, the loss merited a 26-level increase for loss for an Offense Level of 44 before acceptance of responsibility for a Total Offense Level of 41 after, producing a guideline sentencing range of 324-405 months. *Id.*

By permitting the Bitrans to plead to a conspiracy count, however, the government limited the sentence that could be imposed upon the Bitrans to the statutory maximum of 60 months, **81.5% below the applicable guideline sentencing range.** Moreover, while it promised to advocate for the five year maximum sentence, it permitted the Bitrans to argue for as little as two years imprisonment. Judge Wolf ultimately sentenced each of the Bitrans to 45 months, **86% below the guideline range the government believed applied**.

There is little, if any, salient factual difference between the Bitrans' fraud and that committed by Thibeault. The sole difference is the calibration of the sentencing outcome once the maximum penalty, dictated by the government to Judge Wolf in *Bitran* but absent here, is taken into account. The Bitrans' fraud was more massive and extremely sophisticated. They engaged in efforts to cover it up and fought investigation of them. Most importantly, unlike Thibeault's horrifically misguided attempt to save failing business division in his company, the Bitrans' motive was to become even wealthier than they had previously been. And unlike Thibeault's conduct, when the Bitrans deliberately redeemed $13 million of their own holdings at the expense of the other investors, their conduct in executing their scheme turned predatory.

Even assuming a ruling in the government's favor on the sole enhancement in dispute, whether five or more individuals suffered substantial financial hardship, Thibeault's guideline sentencing range is 188-235 months after acceptance of responsibility. Applying the same discount of **81.5%** that the government provided to the Bitrans to Thibeault's range yields a sentence of just under 35 months. The **86%** discount reflected in Judge Wolf's sentence results in a sentence of 30 months. In either case, the sentence proposed by defendant, 36 months, is higher and the Court should impose it.

### C. The Remaining § 3553(a) Factors Weigh in Favor of a 36-Month Sentence

Apart from the guideline sentencing range, all of the § 3553(a) factors point to a sentence of 36 months as one "that is sufficient, but no greater than necessary" to reach the sentencing goals identified by Congress. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences

actually have a general and specific deterrent effect on potential white-collar offenders."). In any event, there can be no serious argument that a sentence beyond 36 months will have any incremental contribution either specific or general deterrence.

Nor is there a need for incapacitation. Thibeault is 41-years-old, a first-time offender, well educated, has been employed throughout his adult life, has been married for eleven years, and has no adult history of abuse of illicit substances. For all male offenders in Criminal History Category I, the recidivism rate is 15.2%. For those over age 41-50 at the time of sentencing, however, the rate in Category I is only 6.9%. For those who are college graduates, the rate in CHC I is just 7.1%; for those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. For those like Thibeault who are educated, have been employed, have been married, are drug free, and over 40, the recidivism rate is certainly much lower. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism*]. For all Category I defendants convicted of fraud, the recidivism rate is just 9.3%, the lowest of any offense category, which is 45% below the rate for all fraud offenders. *Id.*, Exh. 11, at 30. In imposing the least sentence sufficient to account for the need for public protection, this Court should consider the statistically low risk of recidivism presented by Thibeault's history and characteristics. *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the

Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

Finally, the publicity surrounding the offense and the collateral consequences of a securities fraud conviction render it functionally impossible for Thibeault to commit a similar crime in the future. In determining whether there is a need for imprisonment to prevent future crimes, the defendant's inability to commit similar crimes in the future is highly relevant. *See, e.g., United States v. Olis*, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (granting substantial variance in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct."). No term of

imprisonment beyond 36 months is necessary to prevent Thibeault from committing similar crimes in the future.

**CONCLUSION**

For all of the foregoing reasons, defendant submits that the Court should impose a sentence of 36 months imprisonment with three years of supervised release to follow. The Court should not impose a fine, but instead Order restitution as set forth in the plea agreement. The Court should permit defendant to self-report to the facility designated by the Bureau of Prisons. Such a sentence is "sufficient but not greater than necessary" to achieve the sentencing goals embodied in 18 U.S.C. § 3553(a).

DANIEL THIBEAULT
By His Attorney,


/s/ Timothy Watkins
Timothy G. Watkins
Federal Defender Office
51 Sleeper St., Fifth Floor
Boston, MA  02210
Tel: 617-223-8061


CERTIFICATE OF SERVICE

I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), as well as U.S. Probation Officer Marth Victoria by electronic mail, on June 13, 2016.

/s/ Timothy G. Watkins
Timothy G. Watkins