UNITED STATES DISTRICT COURT
DISTRICT MASSACHUSETTS

_____

UNITED STATES OF AMERICA   )
                             )
          v.             )          Criminal No. 15-10031-LTS
                             )
DANIEL THIBEAULT,         )
                             )
      Defendant.       )

_____)

## GOVERNMENT'S SENTENCING MEMORANDUM

Over the course of nearly two years, the defendant, Daniel Thibeault—a Harvard Business School graduate who made millions of dollars by starting a student loan company—created and executed a scheme to defraud hundreds of individuals of their life's savings. Thibeault was indiscriminate in selecting his targets:  young and old, rich and poor, savvy investors and market neophytes alike—all were fair game.  Even close friends and family were not spared.  New parents saving for their children's college tuition, cancer victims putting aside money for future medical expenses, and retirees living off fixed incomes were all defrauded. Using his impressive credentials and his past success to full advantage, Thibeault looked victims in the eye, garnered their trust, obtained discretion over their accounts, and then systematically looted their assets.  In some cases, he actually caused investors to borrow money on margin to fuel the fraud, leaving those victims not only bereft of their savings, but also mired in debt.

Thibeault used the money to maintain a lavish lifestyle and keep afloat a failing business that employed more than a hundred individuals in two countries—all of them paid with stolen money—including a personal chauffeur (whom he also, ultimately, defrauded) who ferried Thibeault around in a Mercedes van equipped with Bloomberg trading terminals.

Even when the jig was obviously up, Thibeault persisted.  He fired employees who raised questions, and threatened others.  He lied to examiners with the Securities and Exchange Commission ("SEC").  In the last days before his arrest, he even continued to solicit investments in one office while meeting with SEC examiners in another.

Since the time he was charged, Thibeault has failed to accept full responsibility for his crimes, or to exhibit any remorse.  To the contrary, he continues to lie to the Court to this day in an effort to minimize the seriousness of his conduct.

In short, the financial and emotional harm Thibeault has wrought is significant.  The government concurs with the Probation Department that the defendant's adjusted offense level is 39 and his criminal history category is I, resulting in a Sentencing Guidelines range of 262 to 327 months.  For the reasons set forth below, and consistent with the terms of the plea agreement in this case, the government respectfully requests that the defendant be sentenced to a term of imprisonment of 180 months.

I.     The Applicable Guidelines Sentencing Range

As set forth in the plea agreement and the Pre-Sentence Report ("PSR"), the government and the defense agree on all applicable Guidelines enhancements save two:  a four-point enhancement for causing substantial financial hardship to five or more individuals, and a three-point deduction for acceptance of responsibility.  The government addresses those in turn.

a.   <u>Substantial Financial Hardship</u>

As set forth in the PSR, the government has identified well more than five individuals who have suffered substantial financial hardship, resulting in a four-level increase to the Guidelines pursuant to USSG §2B1.1(b)(2)(B) (providing for an increase where five or more victims suffer substantial financial hardship).  A review of victim impact statements submitted after the time of the government's submission to the Probation Office suggests that the individuals identified by the government do not include all those who have suffered such harm. Thibeault nonetheless objects to this enhancement on the basis that "the victims did not lose their entire investments" and "most of the victims are financially sound notwithstanding the loss." Those objections are without merit.

The defendant does not, because he cannot, cite any law for the proposition that a victim must sustain a total loss for the harm to qualify as "substantial"—and, indeed, such a contention is inconsistent with the plain language of the Guidelines.  Rather, as the commentary to the Guidelines makes clear, an assessment whether a victim has suffered "substantial" hardship involves consideration of a variety of factors, including but not limited to whether the victim has suffered "substantial loss of a retirement, education, or other savings or investment fund," made substantial changes to his or her employment, such as postponing retirement plans, made substantial changes to his or her living arrangements, such as relocating to a less expensive home, or suffered substantial harm to his or her ability to obtain credit.  <u>See</u> U.S.S.G. § 2B1.1 app. note 4(F).  Each of the victims identified by the government to the Probation Office satisfies at least one of those criteria, and numerous victims qualify on several grounds.  To wit:

- Based on the total value of the Beyond Income Fund (approximately $40 million) and the undisputed loss (in excess of $15 million), <u>all</u> of the victims have sustained losses of nearly 40% of their investments in the Beyond Income Fund.

Some victims have lost far more because, as noted, the defendant caused them to take on margin debt, which they still owe.

- At least eight victims have made changes to their living arrangements as a result of the fraud. C.V.S.[1] has moved to less expensive housing, and receives help from her daughter for monthly expenses. R.Z. and her spouse have abandoned plans to purchase a condominium, and must therefore continue to expend $2,500 per month—out of their total monthly income of $3,500—on rent. M.M. would have had to relocate to a less expensive home, but for the fact that her boyfriend has moved in with her and pays more than half of their household expenses; she has also been unable to refinance her mortgage. D.F. has sold the second residence he inherited from his father. B.G. and his spouse have delayed plans to buy a home nearer to their grandchildren. R.B. and his spouse have deferred plans to put an addition on their home.

- At least five victims have postponed retirement plans. R.S. has delayed his retirement and his spouse has gone back to work to try to recoup their loss. M.B. and his spouse have continued to work part-time jobs to supplement their income. A.S. expects to have to defer her retirement to make up her loss.

- Still other victims have had to take on additional debt. T.L., for example, has been forced to incur tens of thousands of dollars in education loans he would otherwise not have needed.

Against these facts, it is unclear what the defendant means when he contends that "most of the victims are financially sound," or by what criteria he evaluates their purported soundness. They are, to be sure, not homeless; they are not hungry. But if the victims are not destitute, they have nonetheless had their retirement and education plans disrupted, and many no longer feel financially secure. Numerous victims are experiencing anxiety and shame. Some are having sleepless nights. M.M. writes in her victim impact statement that her financial advisor has informed her that her current assets will last less than 10 years. She adds: "I continue to consider various long term options including: returning to the work force, selling my condo and/or borrowing money from my children. My heart breaks at the thought of any of these

---

[1] Victims are identified in this public filing by their initials. The government has provided their full names and more complete descriptions of the harm they sustained to the Probation Office, which has included them in the PSR.

options."  C.V.S. writes:  "I can't sleep wondering where my next dollar is coming from."

S.D.W., who supports herself principally on Social Security payments and residual savings of

less than $20,000, writes that the future "often seem[s] bleak."  The government respectfully

submits that the financial distress these victims and others like them have suffered is

quintessentially the type of harm the Sentencing Commission had in mind in creating an

enhancement for substantial financial hardship.

                b.  <u>Acceptance of Responsibility</u>

In connection with his sentencing, the defendant has submitted to the Probation Office a

proposed Statement of Offense Conduct that is filled with material falsehoods about his conduct.

In conversations and a letter to the defendant's counsel, the government has identified many of

these issues, and requested that the statement be withdrawn.  The defendant, through counsel, has

declined.  The defendant has also contended, in his objections to the PSR, that "he played no role

in creating or running Taft"—the shell company he used in furtherance of his fraud scheme.

That, too, is untrue.  Finally, the defendant has continued to violate the conditions of his release

through contacts with individuals with whom he is under Court order not to have contact.  These

contacts include a recent 45-minute phone call with an individual he was previously found to

have violated the conditions of his release by contacting, in which Thibeault brought up the case

and discussed the individual's possible testimony.  Accordingly, and consistent with the terms of

the plea agreement, the government declines to move for a three-point deduction to the

Guidelines for acceptance of responsibility pursuant to USSG §3E1.1, and respectfully objects to

the inclusion of any such deduction in the Guidelines calculation.

### 1.  Applicable Law

In determining whether a defendant qualifies for acceptance of responsibility credit, the Guidelines consider whether the defendant has "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] or not falsely den[ied] any additional relevant conduct for which the defendant is accountable."  USSG §3E1.1 *app. note* 1(A).  In making this determination, conduct constituting obstructing the administration of justice "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct."  Id. *app. note* 4.  Such conduct includes "providing materially false information to a judge," and "providing materially false information to a probation officer in respect to a presentence or other investigation for the court."  Id. §3C1.1 *app. note* 4(F) & (H).  Simply allocuting to the legal elements of a crime, or even agreeing to all the applicable enhancements does not constitute acceptance of responsibility.  See USSG §3E1.1 app. note 3 ("A defendant who enters a guilty plea is not entitled to an adjustment [for acceptance of responsibility] as a matter of right.").

Violating the conditions of pretrial release may constitute another ground for denying acceptance of responsibility credit.  See, e.g., United States v. Castillo, 588 F. App'x 339 (5th Cir. 2014) (affirming denial of acceptance credit where defendant violated conditions of pretrial release); United States v. Scott, 302 Fed. App'x 185, 187 (4th Cir. 2008) (same); United States v. Warner, 298 Fed. App'x 825 (11th Cir. 2008) (same); United States v. Pletcher, 164 Fed. App'x 308 (3d Cir. 2005) (same, but remanding for resentencing on other grounds).

### 2.  Material Falsehoods in Defense Statement of Offense Conduct

Here, as noted, the defendant has provided materially false information to the Probation Office, and through it to the Court, in an apparent effort to downplay his criminal conduct and

offer a mitigating explanation for his crimes.[2]  The information he has provided goes to the heart

of the conduct for which he stands convicted.  It marks a transparent attempt to minimize the

seriousness of his crimes by suggesting that his scheme started out as a legitimate "business

model," that he had consent from some of his victims to use their identities, and that he simply

slipped into criminal conduct through sloppiness and poor record-keeping.  None of that is true.

Thibeault's scheme was conceived and executed as a massive fraud.  Nothing about it was in any

way legitimate.

 The falsehoods contained in the defendant's statement of offense conduct include, but are

not limited to, contentions that Thibeault: (1) obtained the consent of the first three, or the first

eight, purported loan recipients "to serve as co-makers for loans that would be used to fund the

business;" (2) "vetted many of [the] salient aspects [of the loan scheme] to members of the GL

executive team, and later to its internal compliance officer;" (3) secured the fake loans with his

own assets, and the assets of his business; (4) "had the capacity to service the loans as payments

came due;" (5) "did not enrich himself" through his scheme; and (6) simply "failed to disclose,"

in his interview with the SEC, "that the jumbo loans were completely secured by him and that it

was he who was servicing the loans."

 First, the government has interviewed each of the first eight purported loan recipients

(whose names were used on purported loans issued on or about and between February 27, 2013

and April 5, 2013).  All of them denied applying for, receiving, or knowing about those loans, or

otherwise permitting Thibeault to use their names in connection with any purported loans.

Attached as Exhibit A to this memorandum are sworn affidavits from seven of those

---

[2] Presumably, if the defendant did not himself believe the information to be material to the Court's consideration of the applicable sentence, he would not have provided it.

individuals—including each of the first three purported loan recipients—attesting, under penalty of perjury, to those facts.[3]

Second, the government has interviewed three compliance officers who worked at, or for, Graduate Leverage and the Beyond Income Fund during the time of Thibault's scheme.  All three have denied suggesting, knowing about, or approving a scheme to issue loans in the name of third parties that would be secured by Thibault himself or by the assets of the business, or that would be used to fund the company's operations or to enrich Thibault personally.

Third, the government has been unable to locate any document—and the defendant has refused to provide any—suggesting that the fictitious loans were secured by Thibault himself, by the assets of the business, or otherwise.  None of the Graduate Leverage employees interviewed by the government recalled ever seeing such a document.

Fourth, Thibault's contention that he "had the capacity to service the loans as payments came due" is not only false, but also belied by his own contention, in the very same document, that he resorted to the loan scheme only after his "personal capital investments [in the business] had been depleted," and that he "liquidated all of his personal assets in a desperate and ultimately misguided attempt to save his business and its employees."  As noted in the sworn declaration of SEC forensic accountant Rory Alex (the "Alex Declaration"), attached as Exhibit B to this memorandum, Thibault did not use personal funds to pay interest on the purported loans, but instead simply issued new fictitious loans to pay interest on existing fictitious loans.  The Alex

---

[3] In an interview with the FBI in or about January 2015, one of those individuals, C.H.J., stated that he did not have a loan with Graduate Leverage, Taft Financial Services, or Thibault, and did not give Thibault permission to use his name in any way.  More recently, following a telephone conversation with Thibault in violation of the Court's no-contact order (discussed further below), C.H.J. stated that Thibault did, at some point, ask him to "help out" in connection with a loan related to Thibault's business, and that he agreed to do so, but wanted to discuss the details with Thibault.  C.H.J. stated that the two men did not ever discuss the details, and that he did not ultimately provide his consent to allow his name to be used in connection with a loan.

Declaration provides three examples of instances in which Thibeault used stolen investor funds in this way to pay interest on previously issued loans.

Fifth, Thibeault's contention that he did not enrich himself through the loan scheme is untrue. As set forth in the Alex Declaration, Thibeault withdrew at least $1 million from Graduate Leverage's operating account in 2013 and 2014, even as he repeatedly filled the operating account with money stolen from investors.

Sixth, Thibeault's contention that, in his interview with SEC examiners, he simply "failed to disclose that the jumbo loans were completely secured by him and that it was he who was servicing the loans" is untrue for the reasons previously set forth: the loans were not secured by Thibeault and he did not "service" them personally, but rather kept his scheme going by issuing new loans using stolen funds. Moreover, Thibeault's contention that he "failed to disclose" certain facts materially minimizes what actually happened. In fact, Thibeault affirmatively lied to the SEC repeatedly over the course of his interview, by telling SEC examiners, among other things, that the loans were issued to individual customers, that the funds went to those customers or their creditors, and that neither he nor the company ever made interest or principal payments on the loans.

### 3.   Material Falsehoods in the Defendant's Objections to the PSR

Thibeault contends, in his objections to the PSR, that "he played no role in creating or running Taft"—the shell company he used in furtherance of his fraud scheme. That is untrue. Once again, Thibeault's objection marks an attempt to distance himself from his crimes. Contrary to the defendant's contentions, Taft was an essential element of his fraud scheme and its use in furtherance of the fraud came entirely at Thibeault's direction. The fictitious loans that the defendant created, and that were held by the Beyond Income Fund, were purportedly issued

by Taft—an entity that, to all appearances, was unrelated to the defendant and his company.  At the defendant's direction, investor money was directed from the Beyond Income Fund, via its custodian bank, to Taft—purportedly for the purpose of issuing the loans.  From Taft, the investor money was then diverted, at the defendant's direction, into the general operating account of the defendant's company, Graduate Leverage, where it was used to pay the company's operating expenses.  As set forth below, the defendant also directed the transfer of more than $1 million from the operating account into his personal bank account or used it to pay his personal expenses.

While Thibeault did not personally execute the legal documentation involved in establishing Taft—precisely because the whole idea was to establish an entity that appeared to be at arms-length from him— Thibeault was intimately involved in the creation and operation of Taft.  Indeed, as set forth in the sworn affidavit of E.K., the defendant's longtime friend, it was Thibeault who called him and asked to use E.K.'s name in setting up the shell company.  (See Affidavit of E.K., attached hereto as Exhibit C).  As E.K. attests:  "Thibeault said he was starting a company called Taft and wanted to use my name and address to establish the company.  My understanding from Thibeault was that Taft would service and issue loans."  (Id.)  E.K. further notes that it was Thibeault who later authorized E.K. to withdraw funds from the Taft bank account for E.K.'s personal use.  (Id.)

### 4.  Violations of the Conditions of Pretrial Release

In May 2015, Magistrate Judge Kelley found, after a multi-day proceeding, that the defendant had "violated his conditions of release by contacting victims as he was ordered not to do by the Court on February 24, 2015."  (Dkt. 64).   Among the individuals as to whom the government presented evidence that the defendant had had improper communications were J.M.

and C.J., whose names were used on two of the fictitious loans.  (J.M. was also an investor in the

Beyond Income Fund.)  In imposing tightened conditions of release, Judge Kelley ordered,

among other things, that the defendant "shall not have direct or indirect contact with any victim,

former client of GL, or former employee of GL, except for those on a list which defendant will

provide to the Court and the government for approval."  (Dkt. 61).  The Court also ordered

Thibeault to submit a monthly phone bill to the government and to identify any calls with a

person subject to the no-contact order "to ensure compliance with the Court's order."  (Id.).

On May 31, 2016, the defendant belatedly provided to the government call records for the

period February 14 through May 13, 2016.  The records are attached hereto as Exhibit D.  In a

letter accompanying the records, the defendant disclosed, through counsel, that he had a three-

minute telephone conversation with J.M. on March 14, 2106 and later received a text message

from him.  In addition, the defendant disclosed that on April 13, 2016, he received a text from

and then spoke by telephone with C.H.J.  *Call records indicate that the call was approximately*

*45 minutes in length.*  The defendant contends that "[t]hey spoke primarily about the passing of a

mutual friend whose wake [C.H.J.] had attended and caught up on their longtime friendship as

well."  In addition, the letter disclosed that the defendant and C.H.J. discussed the instant case,

specifically "the fact that [C.H.J.] had been previously interviewed by the FBI."

The defendant's description of his discussion with C.J. is, at a minimum, incomplete.  As

set forth in the sworn affidavit of C.H.J., included in Exhibit A, it was Thibeault who brought up

the FBI during the conversation, and inquired about C.H.J.'s prior interview by the FBI.  C.H.J.

and Thibeault then discussed what C.H.J. had told the FBI and what his understanding of the

loan was.  Thibeault told C.H.J. that somebody—C.H.J. understood him to mean either the FBI

or his attorney—would probably reach out to him to discuss the loan.  At no time during the

conversation did Thibeault mention the no-contact order, or the fact that he was barred from having any contact with C.H.J.

The defendant's flagrant and repeated violations of the no-contact order—on the eve of his sentencing and after having previously been found to have violated the same no-contact order *with the same parties*—demonstrates his profound disregard for the law and lack of respect for the Court's authority.

Because the defendant has thus (1) failed to truthfully admit the conduct comprising the offenses of his conviction (notwithstanding his allocution to the essential elements of those crimes), and denied additional relevant conduct for which he is accountable, (2) obstructed justice by providing materially false information to the Court and the Probation Office in connection with his sentencing, and (3) repeatedly violated the conditions of his release, he does not qualify for acceptance of responsibility credit.

### c.   Other Guidelines Issues

As noted, the defendant does not dispute the application of a twenty-level enhancement for loss, a two-level enhancement for sophisticated means, a four-level enhancement for violating securities law while acting as an investment adviser or a person associated with an investment adviser, and a two-level enhancement for obstructing justice by lying to the SEC. The result of these enhancements is a total offense level of 39, and a Guidelines sentencing range of 262 to 327 months.

### II.   Application of Section 3553(a) Factors

### a.   The Nature and Circumstances of the Offense

The defendant's crimes were as brazen as they are disturbing.  A highly successful entrepreneur, Thibeault earned millions of dollars before the age of 30 from a student-loan

business that he started while still a graduate student.  As that business faded, Thibeault sought to transform it into a broader financial-services empire, hiring hundreds of employees, at vast expense, in the United States and the Philippines.  And when, after hemorrhaging red ink for years, that business failed, the defendant turned to fraud to keep it going.  Singlehandedly, he conceived and executed a complex scheme to mulct his clients, friends, and even family.  These victims trusted him, and many gave him unfettered discretion over their financial affairs.  Betraying that trust, Thibeault systematically bilked them of their life-savings—including even retirees in the twilight of their lives, who were left with little hope of recovering their losses.

From the beginning, the defendant was aware of what he was doing and whom he was defrauding.  He knew many of his clients well, and solicited their investments personally.  Consider, for example, H.L., the defendant's longtime personal assistant and the nanny to his only child. Thibeault personally assured her of the safety of her investment, and showed her a spreadsheet of her assets growing over decades.  H.L. notes in her victim impact statement that she trusted Thibeault "implicitly" and felt more like a family member than an employee.  She and her spouse invested their life-savings—$60,000—in the Beyond Income Fund.  Only after learning of Thibeault's deception and the fraud he had perpetrated did she also find out that Thibeault, with discretion over her account, not only bilked her of her money, but also took out margin loans in her name that magnified her losses and have left her mired in debt.

Thibeault similarly encouraged his employees to solicit their own family and friends.  S.B., who served for a time as Graduate Leverage's chief operating officer, notes in his victim impact statement that he solicited his father, girlfriend, and professional mentor to invest in the fund.  He notes:  "These were people . . . who trusted me enough to invest in something . . . in which I believed.  From a personal perspective, the damage that was done to some of these

relationships is extensive.  Psychologically, it has been difficult to re-engage some of these people for shame that I was the conduit that exposed them to this fraud.  I fear I have lost trust and credibility; and wondered for a time, if even my own father trusted me."

Thibeault's crime was calculated and methodical.  Dozens upon dozens of times, the defendant created bogus six-figure loans in the names of close friends and acquaintances, and then directed the proceeds of those loans into the company's coffers, and into his own account.  Each time, the defendant renewed his commitment to his massive fraud.

Over and over again, in countless face-to-face meetings held over nearly two *years*, the defendant lied to his victims and his employees—looking them in the eye as he encouraged them to invest everything they had in a fund that he promised was safe and secure.  Worse, Thibeault marketed the fund *specifically* to conservative investors who wanted nothing more than reasonable returns at low risk.  The fund's 2014 prospectus pledged that the fund would "reduce default risk by focusing on issuers that it believes are less susceptible to economic downturns such as medical doctors, dentists, veterinarians, attorneys and business owners . . . control risk by diversifying among issuers in various geographic regions . . . [and] reduce interest rate risk by selecting variable rate notes that are expected to have low price sensitivity to rising interest rates."  And a press release announcing the fund to investors noted that its goal was "to provide an opportunity to investors seeking income without high levels of interest rate and credit exposure."  Then Thibeault simply took their money and used it for his own purposes.

Once, relatively early on, when the fraud nearly came to light after Graduate Leverage employees mistakenly sent a loan statement to Z.W.—a friend and former college roommate of Thibeault's, whose name he had used on a bogus loan—Thibeault scrambled to ensure that the scheme did not unravel.  As Z.W. notes in his sworn affidavit, Thibeault spoke with Z.W.'s

accountant and told her "not to worry about" the loan notice.  Z.W. assumed that Thibeault was "playing a prank" on him.  Undeterred by this near-miss, Thibeault persisted with his fraud, issuing dozens more fake loans, stealing millions more from his hundreds of victims.

And when the scheme finally did unravel, Thibeault continued to seek out victims until the last possible moment.  Former Graduate Leverage employee M.B. describes an instance in December 2014, on the eve of Thibeault's arrest, in which Thibeault solicited money from a registered investment adviser in one room, while meeting with SEC examiners asking about the fraudulent loans in another.  M.B. writes:  "He showed no regard for the [Registered Investment Adviser] or their clients and pressed them to increase their investment.  He knew full well that he was caught red handed and was desperately trying to obtain more assets to steal."

Indeed, the loss calculation that drives Thibeault's Sentencing Guidelines range in some sense understates the severity of the harm, which is more than just a function of the magnitude of the dollar loss.  In measuring Thibeault's culpability, the Court should take into account the fact that Thibeault targeted childhood friends, loyal employees, and elderly retirees, and left many of them unsure whether they will be able to sustain themselves financially for the duration of their lives. The harms that these victims have suffered are as profound as any that can, superficially, be measured in dollars and cents.

b.   The Defendant's History and Characteristics

Educated at the finest schools, and blessed since childhood with advantages and opportunities available to few, Thibeault was a wealthy entrepreneur who enjoyed the trappings of success:  homes in two states, luxury cars, and personal staff, including a private driver who chauffeured him to appointments in a Mercedes van equipped with Bloomberg trading terminals. He invested in gold bars, and his wife wore an eight-carat diamond ring worth nearly $100,000.

Creative, hard-working, and full of ideas, he was, by all accounts, a brilliant businessman.  And he could be generous.  When friends needed money, Thibeault provided it, often with no questions asked.  In this way, he earned their gratitude and their loyalty.

But Thibeault was also an imperious, often cruel, manager who did not tolerate dissent.  Secretive, hot-tempered and controlling, he screamed at and publicly belittled those who disagreed with him, and threatened or fired those who questioned him.  His employees feared him.  As one former Graduate Leverage employee, J.B., wrote in his victim impact statement:

> I was bullied and I witnessed numerous other respectable,
> reputable colleagues get bullied as well.  I was told on more than
> one occasion, either directly or indirectly, that if I did not perform
> a task as requested I would be replaced by someone who would.  I
> had witnessed Mr. Thibeault explain the same to a former
> colleague in a similar role of trading. . . .  Mr. Thibeault simply
> never took 'no' for an answer under any circumstance.  I watched
> colleague[s] get fired for standing up to him as a part of their job.

Fueled by early success and deep pockets, Thibeault set out to build a financial-services empire.  His early business partners saw the plan as folly, and left the company.  Undeterred, Thibeault persisted, pouring money into the venture and hiring hundreds of employees in two countries.  And when, after years, the venture continued to lose money, he refused to shut it down, shrink it, or use his own assets to continue supporting it.  Instead, he turned to fraud.

Consistently, he has placed his own interests ahead of others, and displayed disdain for the devastation he wrought upon those who placed their trust in him.  The victim impact statement of J.L. is noteworthy.  A close friend since college, J.L. and his brother F.L. both worked for Thibeault at Graduate Leverage.  Ultimately, Thibeault named F.L. the co-portfolio manager of the Beyond Income Fund, despite F.L.'s lack of experience managing money.  In November 2014, F.L. resigned from Graduate Leverage over concerns about the purported loans Thibeault had issued, and suggested to Thibeault that he would report Thibeault to regulatory

authorities.  J.L. writes that Thibeault called him that night "and indicated that [F.L.] was taking actions that would 'take down the firm' and could put Mr. Thibeault in jail."  According to J.L., Thibeault called him repeatedly in the ensuing days, and "pressured [J.L.] to speak with my brother . . . saying that [F.L.'s] actions were going to destroy the firm and Dan personally."  Thibeault ultimately fired J.L.—whose young daughter, he knew, suffered from cerebral palsy— suggesting that he would retract the termination only if J.L. could persuade F.L. "to say he was not aware of any regulatory problems or issues at the firm."  J.L. writes:  "In my last phone conversation with Dan, he had begun a tirade of abusive language when he realized I would not deliver on his demands with regards to my brother's resignation letter.  He then yelled profanities toward me while asking if I 'was going to stand up as a man and provide support for my family and daughter.'"

Thibeault has never apologized to his victims or shown remorse for his crimes.  Through counsel, he has suggested in court filings that this is because he is under a Court-imposed no-contact order.  As noted, however, Thibeault has repeatedly flouted that order, including as recently as a few weeks ago, belying his excuses and demonstrating his continued lack of respect for the law.

The defendant has also provided to the Probation Office documentation concerning his treatment for anxiety and attention deficit disorder ("ADD"), and his use of medications to treat those conditions.  He contends that as his business deteriorated, he "began taking increasing amounts of Celexa, Xanax, and Adderall to cope with the stress."  (PSR ¶ 40).  Through counsel, Thibeault has suggested that he intends to rely on those conditions at sentencing, and indeed, the PSR notes that Thibeault "believes that he was an addict and that his use of these drugs caused him to engage in risky behaviors."  (Id. ¶ 97).

The defendant's attempt to use ADD and anxiety as excuses for his crimes should be rejected.  The PSR makes clear that Thibeault was diagnosed with ADD in the seventh grade, but nonetheless excelled and received good grades through high school and college.  (Id. ¶ 99).  The defendant's conditions also were no obstacle to his enormous success at Harvard Business School and in the early part of his career.  And, of course, there is no evidence that they in any way interfered with his ability to tell right from wrong.

Moreover, it is unsurprising that a criminal would be anxious.  In Thibeault's case, that anxiety appears to be as much about the fact that he got caught, and must now face the consequences, as about the harm he inflicted on others.  Tellingly, the PSR notes that Thibeault's chosen physician, who conducted a mental health evaluation and counseled him between December 2014 and March 2015, "indicated that the defendant did not seem clinically depressed, but rather sad and anxious about his pending federal case."  (Id. ¶ 93).  Equally telling is the fact that, even as Thibeault invokes his own purported anxiety in seeking a reduced sentence, he gives short shrift to the anxiety and sleepless nights he has caused his victims in disputing that he caused them substantial financial harm.

       c.  <u>The Need for Just Punishment and Adequate Deterrence</u>

The defendant stole money not out of personal desperation, not because he suffered under the enduring legacy of some challenging upbringing, not because he lacked the ability to appreciate the wrongfulness of his actions, but rather because of his arrogance and ambition, because he cared little for the well-being of others, and because he thought he was smarter than everyone else and could get away with it.  The harm he wrought will endure for the remainder of his victims' lives.

Principles of general and specific deterrence and just punishment counsel in favor of a lengthy sentence.  There is simply no evidence that the defendant has learned from his actions, or that he is reformed.  To the contrary, just months after getting caught and arrested, the defendant sought to set up a financial-services firm that would inherit the customers and carry on many of the businesses of Graduate Leverage.  That effort—conducted through third parties acting at the defendant's direction, and shrouded in secrecy to hide the defendant's involvement—was ultimately detected by law enforcement, and blocked by order of the magistrate judge.  But Thibeault was found to have violated the conditions of his pretrial release by contacting several of his victims.  (See Dkt. 64).  And even after being sternly admonished and placed on significantly tightened conditions, the defendant has continued to have contacts with those same individuals, in open defiance of the Court's unambiguous order, demonstrating his disregard for the law.  In short, Thibeault's actions since being discovered—including his continued efforts to minimize his crimes and to mislead this Court about them, even on the eve of his sentencing— are compelling evidence that he feels no remorse, and that he would, if he could, do it again.

III.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of incarceration of 180 months, or 15 years.  The requested term of incarceration, while well below the applicable Sentencing Guidelines level, is consistent with the maximum sentence the government is permitted to request under the terms of the plea agreement in this case, and is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment and adequate deterrence.  With good-time credit and assuming that the defendant participates in the Residential Drug Abuse Program—as he has already expressed interest in doing (PSR ¶ 98)—such a sentence would likely result in actual

prison time of less than 12 years.  The government respectfully submits that a lesser sentence would be insufficient to reflect the scale of the loss and the severity of the harm the victims have endured.

Dated: June 13, 2016

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: */s/ Stephen E. Frank*
STEPHEN E. FRANK
BRIAN A. PÉREZ-DAPLE
Assistant U.S. Attorneys
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3244/3318

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date.

Dated: June 13, 2016

<u>*/s/ Stephen E. Frank*</u>
STEPHEN E. FRANK
